**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.:22-cr-174 (TNM)** |
| **v.** | : | |
| | : | |
| **MATTHEW SHARP,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew Sharp to a Guidelines sentence of 180 months' incarceration, followed by 10 years' supervised release.

## I.     Factual and Procedural Background

On October 1, 2020, an undercover law enforcement officer ("UC") entered the "you.ngshare" KIK group, a group that was designed to allow its members to trade and view child pornography. The UC continued to monitor activity in the group over the next several days. Between October 1, 2020 and November 17, 2020, approximately 400 users joined the "you.ngshare" group for the purpose of exchanging child pornography and discussing the sexual abuse of children. *See* Presentence Investigation Report ("PSR") ¶ 14. The Defendant was the creator and administer of the "you.ngshare" group, and he personally required new users to "verify" when joining the group. *Id.* ¶ 16.

1

On October 1, 2020, the Defendant sent the UC a direct message via KIK asking him to "verify," meaning to prove that he either possessed child pornography or that he had access to a child. *Id.* ¶ 15. The Defendant specifically asked the UC to send him "cp," or in the alternative to send "a live photo" of a child. *Id.* The Defendant further stated to the UC that most of the users in the group were "cp collectors," indicating that group members collected child pornography. The same day, the Defendant posted two videos to the group. Both videos depicted adult men inserting their penises into the mouths of prepubescent girls. *Id.* ¶ 16. The defendant distributed additional videos depicting child sexual assault in the group.

On January 7, 2021, law enforcement agents seized the Defendant's digital devices, and those devices were forensically examined. *Id.* ¶ 17. The Defendant's cell phone contained 112 photographs and 59 videos depicting the sexual abuse of children. *Id.* Of the 59 videos, 55 of them were in a password-protected folder organized with subfolders with the following titles: "Cum," "Kik," and "Mega Downloads." *Id.* ¶ 19. The Defendant admitted to law enforcement that he was in fact the administrator of the "you.ngshare" group. *Id.* ¶ 20. The Defendant further admitted that members of the group shared images of child pornography with him and that he himself distributed child pornography to other KIK users approximately 50 to 100 times. *Id.*

The Defendant pled guilty to one count of Distribution of Child Pornography on September 16, 2022. *Id.* ¶ 4. The government now files this Sentencing Memorandum, and respectfully requests that the Court impose a Guidelines sentence of 180 months, to be followed by 10 years' supervised release.

## II.     The Sentencing Guidelines and Guidelines Analysis

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment

principles articulated in *Blakely v. Washington*, 542 U.S. 961 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 543 U.S. at 244.

In post-*Booker* cases, the Supreme Court has instructed that a district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated the Defendant's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.2(a)(2)) | 22 |
| Specific Offense Characteristics | |
| Depictions of minors under 12 (U.S.S.G. §2G2.2(b)(2) | +2 |
| Knowingly engaged in distribution (U.S.S.G. §2G2.2(b)(3)(F) | +2 |

| | |
|---|---|
| Use of a computer U.S.S.G. §2G2.2(b)(6) | +2 |
| Involved 600+ images U.S.S.G. §2G2.2(b)(7)(D) | +5 |
| Organizer/leader §3B1.1(a) | +4 |
| Acceptance of responsibility U.S.S.G. §3E1.1(a) & 3E1.1(b) | -3 |
| Total Adjusted Offense Level | 34 |

*See* PSR at ¶¶ 30-43.

The U.S. Probation Office calculated the Defendant's criminal history as a Category I, which is not disputed. *Id.* at ¶ 46. Accordingly, the U.S. Probation Office calculated the Defendant's total adjusted offense level at 34, and his corresponding Guidelines imprisonment range at 151 to 188 months. *Id.* at ¶ 114.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's

> on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. <u>See</u> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide a helpful benchmark, and remain a necessary factor for the Court's consideration.

### III.   A Guidelines Sentence of 180 Months Accurately Reflects the 18 U.S.C. § 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[1]  These factors include:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

---

[7] Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines serve only an advisory function. *Id.* at 245. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point. *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

(2)      the need for the sentence imposed –

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(3)      the kinds of sentences available;

(4)      the applicable sentencing guidelines range for the offense;

(5)      pertinent policy statements issued by the U.S. Sentencing Commission;

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

### A.  The Nature and Circumstances of the Offense

The Defendant's conduct in this case is extremely serious. The Defendant not only distributed child pornography in this case, but also created an online chat group wherein the sole purpose was trading and collecting child pornography images and videos depicting the sexual abuse of very young children. The Defendant's conduct allowed 400 other individuals with a sexual interest in children to join a "safe" and private internet community where they could interact with each other to discuss and share images and videos depicting child sexual abuse. The Defendant personally solicited child pornography from members of his group and personally required that each of the members who joined the group share child pornography directly with him or prove that the user had access to a live child in order to join the group. When new members

provided child pornography images and videos as part of the verification process, the Defendant then shared those images and videos to the group, providing the group with a steady stream of images and videos depicting the sexual abuse of very young children.

The Defendant's offenses have been perpetrated against the most vulnerable members of our society – children. Children captured in images and videos depicting their sexual abuse are traumatized and victimized in the worst way imaginable at the time the images were created, and they are re-victimized and re-traumatized each and every time an individual views the images for their own sexual gratification. As eloquently explained by the Sixth Circuit in a child pornography case:

> . . . we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of . . . children who are forced into these roles.
> . . . every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-22 (6th Cir. 2011) (quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

Each one of the images and videos the Defendant distributed and encouraged others in the group to distribute represents an innocent child victim who had the worst moments of their lives

forever memorialized and spread to countless offenders all over the world via the internet. *See Blinkinsop*, 606 F.3d 1110, 1118 (9th Cir. 2010) (finding that "[t]he children involved in pictorial and cinematic pornography additionally endure ongoing harm because their images have been preserved in a permanent medium"). In *New York v. Ferber*, the U.S. Supreme Court noted:

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.  A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

458 U.S. 747, 759 n.10 (1982), *quoting* Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981).

The Defendant's conduct in creating an online community for individuals with a sexual interest in children and distributing child pornography images is extremely serious and dangerous. The conduct that brings the Defendant before the Court was not a one-time occurrence, nor a mistake. The Defendant intentionally solicited, received, shared, and possessed child pornography. This is not a case where the defendant only distributed a few images containing child pornography; rather, this Defendant created and maintained a dangerous online community specifically designed for other like-minded pedophiles. Given the extremely serious nature of the Defendant's criminal conduct, a Guidelines sentence of 180 months' is appropriate.

### B.  The History and Characteristics of the Defendant

The Defendant's lack of criminal history does not accurately reflect his history and characteristics given the nature of the offense in this matter. The Defendant created and maintained an online group for individuals with a sexual interest in children. The Defendant provided this online space for 400 others to discuss child sexual abuse and to share images and videos depicting such abuse. This conduct continued for over a month, with the Defendant personally asking new

members of the group to verify by providing him with images of child pornography or images of a real child the member had access to. The Defendant was only caught by law enforcement when an undercover law enforcement officer was able to infiltrate the Defendant's KIK group. Indeed, the Defendant has admitted to engaging in this criminal conduct for a lengthy time-period (many months) before he was detected by law enforcement. Thus, the Defendant's lack of a criminal record *only* reflects his ability to evade law enforcement detection, not an absence of criminal intent or criminal conduct.

The Defendant has also acknowledged that he had become obsessive about pornography in the months before his instant offense and that his preferred age range had "started going down and down." PSR at ¶ 81. The Defendant did not seek out help for his pornography obsession even as he recognized his preferred age range decreasing, rather he continued to indulge in criminal behavior until he got caught. The Defendant has admitted that prior to being caught by the UC in the instant case, the Defendant had participated in other online groups in which child pornography was shared. Roush Defense-Procured Evaluation at 7. After approximately five months of participating in those groups, the Defendant's behavior progressed, and he went on to create his own KIK group. *Id.* As the administrator of his own group, the Defendant demanded that each group member directly send him child pornography or a photograph of a live child the member had access to. This went on for over a month, until mid-November 2020. Of course, it is important to note that the Defendant's electronic devices were seized and searched after January 7, 2021, and the Defendant had dozens of images and videos depicting child pornography and the rape of young children saved in his personal password-protected files. Clearly, the Defendant's behavior escalated from participating in child pornography online groups, to creating his own group for 400 offenders, to personally soliciting child pornography from members of his group, to sharing child

pornography with hundreds of others, and to collecting and saving hundreds of images and videos containing child pornography.

The circumstances of the instant offense, the protracted time frame over which his escalating conduct occurred, as well as the fact that the Defendant still possessed numerous child pornography images and videos on his devices at the time of his arrest demonstrate the need for a Guidelines sentence to appropriately address his criminal conduct.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The sexual exploitation of children, including online discussions about abuse, as well as the downloading, viewing and possession of child sexual abuse material, has devastating consequences for the children depicted in these images and videos. Once they find their way onto the Internet, images and videos depicting the sexual abuse of a child will circulate in perpetuity because individuals make the repetitive and purposeful decision to collect, save, and trade such images and videos for their own sexual gratification.

Furthermore, consumers and distributers of child pornography, like the Defendant, create a market and demand for the production of these images and videos, which depict the sexual abuse and exploitation of real children. These consumers and distributers contribute to the cycle of abuse and are in part responsible for the harm suffered by children used to produce the images and videos in their collections. *See United States v. Goff,* 501 F.3d 250, 259-60 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"); *see also United States v. Accardi*, 669 F.3d at 345 (D.C. Cir. 2012) (emphasizing that "child pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials.") In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007).

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996). There is perhaps no greater invasion of privacy than that caused by the dissemination of child pornography. With a click of the button on a camera, the sexual abuse of these children is memorialized forever. It is terrible enough that a child must live with the memory of his or her initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

The Defendant created a market and demand for materials depicting the sexual abuse and exploitation of real children. The Court need only review the Victim Impact Statements from the victims in the images and videos he possessed in order to understand the devastating effect that the production and dissemination of those videos actually has had on real child victims. *See* Exhibit 2, Victim Impact Statements. Therefore, with respect to 18 U.S.C. § 3553(a)(2)(A), a Guidelines sentence of 180 months' incarceration accounts for the seriousness of the Defendant's conduct.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence with respect to child pornography offenses is of particular import for three reasons. First, serious penalties for child pornography offenders decrease the number of participants in the market, which in turn decreases the need for its production.

> The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

*Goldberg*, 491 F.3d at 672.

Second, both Congress and the courts have recognized the high recidivism rates for these types of offenders. *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009) (compiling congressional statements regarding the high risk of recidivism among child sex offenders); *Accardi*, 669 F.3d at 346 (noting that "a number of circuits have upheld [sentences] . . . for defendants convicted of possession of child pornography based on the same general concerns about recidivism") (citing *United States v. Cope*, 527 F.3d 944, 952 (9th Cir. 2008) (noting that, there, the "sentence [was based] on general concerns about recidivism and protection of the public."))); *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008);

*United States v. Allison*, 447 F.3d 402, 405-06 (5th Cir. 2006); *United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011) ("We need evidence-driven law just as we need evidence-driven medicine . . . statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children") (citations omitted)).

Third, there is an undeniable link between sexual contact offenses and the receipt and distribution of child pornography. "An offender's pornography and erotica collection is the single best indicator of what he wants to do." *See* Lanning, Kenneth V., *Child Molesters: A Behavioral Analysis – For Professionals Investigating the Sexual Exploitation of Children*, Office of Juvenile Justice and Delinquency Prevention, Fifth Ed. 2010, at 107.

Each of these factors is important in this case. The Defendant was not only a participant in the market for images of child sexual abuse material, but he started an online forum designed to disseminate images and videos depicting such abuse. The Defendant himself supplied a group of approximately 400 members with a steady stream of images and videos depicting child sexual abuse. Imposing a lengthy sentence of incarceration for the Defendant would deter him and likeminded criminals from continuing to participate in that market.

### F.  The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Section 3553(a)(6) directs courts to consider avoiding *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." It "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

While it is true that other offenders sentenced in this District on charges related to the distribution of child pornography have received sentences below the Guidelines sentence that the

Government is requesting, imposing a Guidelines sentence of 180 months' in this case would not create an unwarranted disparity. This case is easily distinguishable from the vast majority of other distribution cases, which typically involve distributions to undercover law enforcement officers, or distribution charged to a very narrow time period of 1-2 days. These cases are easily distinguishable from the Defendant's, in which he has admitted to creating an online group for over 400 likeminded pedophiles, actively "verifying" with each member of the group by demanding child pornography be sent directly to him or a photograph of a live child. Over the course of nearly two months, this offender repeatedly wrote and published to this large group noticing, not only seeking, but requiring each member to exchange, display and distribute child pornography – directly to him for distribution to the group.  In this fashion, he actively solicited, received, and distributed dozens of child pornography images and videos to hundreds of other likeminded offenders for over a month. This conduct meets the elements of 18 U.S.C. Section 2251(d). *See* 18 U.S.C. § 2251(d) (Sexual Exploitation of Children). Recognizing that this conduct is more serious than the Distribution of Child Pornography by itself, Congress has imposed a mandatory minimum sentence of 15-years for violations of 18 U.S.C. Section 2251(d). *See* 18 U.S.C. § 2251(e).

When an offense is uniquely serious, courts will consider the need to impose "stiffer sentences" that "justif[y] the risk of potential disparities." *United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017); *see also Accardi*, 669 F.3d at 346 (concluding that a within-Guidelines sentence for a child-pornography offense did not produce an unwarranted disparity when the images distributed by the defendant "were much more aggressive and troubling than the images distributed by other offenders" who received lesser sentences).  In the present case, the Defendant's

conduct is similar to cases where the offenders were charged under 18 U.S. Code § 2251(d)(1)[2] and received substantially longer sentences. *See United States v. John McClain*, 19-cr-275 (D.D.C.) (Defendant sentenced to 180 months following guilty plea to noticing or advertising child pornography); *United States v. Daniel Nickelson,* 19-cr-247 (D.D.C.) (Defendant sentenced to 180 months following a guilty plea to noticing or advertising child pornography). Both *McClain* and *Nickelson* were members of KIK groups that were dedicated to the distribution and receipt of child pornography. Similar to the Defendant's case, *McClain* and *Nickelson* were both caught when law enforcement, acting in an undercover capacity, infiltrated the KIK groups and observed the criminal conduct that was occurring. Much like Defendant Sharp, both *McClain* and *Nickelson* were not merely members of KIK groups, they held leadership roles. *Nickelson* was the administrator of a private KIK group, while *McClain* was the chat moderator in his KIK group. Like Defendant Sharp, *McClain* and *Nickelson* "screened" the participants in their group and were responsible for admitting and removing other members of the group. Given all of these factors, a sentence as the Government is recommending avoids creating an unwarranted sentencing disparity between defendants with similar records who have been convicted for similar conduct.

## IV.   Dr. Boyd and Dr. Roush's Reports are of Minimal Value to the Court

The Court should proceed cautiously when determining how much weight to give to Dr. Boyd and Dr. Roush's psychosexual reports as it fashions an appropriate sentence for the Defendant. Both doctors were hired by the defense to conduct their evaluations. *See* Boyd Defense-Procured Evaluation, Roush Eval. Both doctors based their conclusions almost exclusively on the Defendant's self-serving statements, and in consultation with defense counsel. *Id.* Neither doctor

---

[2] The government is requesting a sentence of 180 months' incarceration, which is consistent with the mandatory minimum sentence for a violation of 18 U.S. Code § 2251(d)(1).

interviewed any collateral contacts to verify information provided by the Defendant. *Id.* Moreover, neither doctor consulted with the government, nor did they review the images that the Defendant sought out, solicited, distributed, and saved. *Id.* Both doctors concluded that the Defendant does not have a dangerous sexual attraction to minors; however, that conclusion is simply implausible given that the Defendant admitted to participating in KIK groups in which child pornography was exchanged for several months, then went on to create a group designed to discuss and share child sexual abuse materials, and finally that he maintained his own personal password-protected collection of images and videos depicting child sexual abuse.[3]

Dr. Roush seems to suggest that the Defendant became an administrator of the KIK "you.ngshare" group in order to gain power / control over his own life and because he had been seeking out leadership opportunities. Roush Eval. at 7, 11. That "explanation" dangerously minimizes the Defendant's admitted criminal conduct and his deliberate choice to collect and share pornography that depicts young victims of sexual assault. Dr. Roush also opines that the Defendant has a low chance of recidivism, yet then inconsistently and concerningly notes that the Defendant's "thinking, behavior and attributes are markedly similar to those of known adult sex offenders." Roush Eval. at 7. Dr. Boyd's "serious concerns" about the Defendant's incarceration are inconsistent with her own assessment that, "individuals engaging in online-related [child pornography possession and distribution] are qualitatively different from other kinds of offenders." Boyd Eval. at 14, 16 (internal citations omitted). In their conclusions that the Defendant does not have a dangerous and pervasive sexual interest in children, both doctors fail to acknowledge that

---

[3] There is nothing in either report indicating that either doctor asked the Defendant if he masturbated or received sexual gratification specifically when viewing images and videos depicting child sexual abuse. Neither doctor confronted the Defendant about *why* he possessed so many images and videos depicting child sexual abuse. That information would certainly be relevant to any assessment of the Defendant's sexual interest in children.

"individuals may still be diagnosed with pedophilic disorder despite the absence of self-reported distress." *See* pages 697 to 700 from the DSM V, attached to this Sentencing Memorandum as Exhibit 1. Neither Dr. Roush nor Dr. Boyd explain why the Defendant participated in other child pornography-sharing online groups prior to creating his own, nor do they explain why the Defendant created this KIK group for the sole purpose of distributing, receiving, and discussing child sexual abuse images and videos. Both doctors fail to explain why the Defendant personally "verified" with each group member by demanding child pornography or photographs of live children be sent directly to him, and both doctors fail to explain why the Defendant personally saved dozens of images and videos depicting the sexual abuse of children.

While the United States Sentencing Guidelines permit this Court at Sentencing to consider "relevant information without regard to its admissibility under the rules of evidence applicable at trial,' that information must have "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). *United States v. James*, Crim. No. 17-184 (RJL), 2019 WL2516413, at \*1 (D.D.C. June 18, 2019) (noting that sufficient extrinsic corroboration was necessary before Court would consider evidence at sentencing). An expert's report may be excluded from consideration at Sentencing if it 1) "does not demonstrate or disclose sufficient facts or data on which [the expert's] conclusion is based"; 2) "does not disclose reliable principles and methods from which [the expert's] conclusion is drawn"; and 3) "does not demonstrate that [the expert] applied reliable principles and methods reliably to the facts of the case." *Estate of Gaither ex rel. Gaither v. District of Columbia*, Civ. No. 03-1458(CKK)(AK), 2008 WL 5869878, at \*3-4 (D.D.C. July 30, 2008).

The District of Columbia Circuit's ruling in *United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008). In *Day*, the court affirmed the District Court's decision to exclude expert testimony, due to the expert's failure to articulate what he "concluded from any individual test result, interview, or

expert report," making it "virtually impossible for the Government to engage" with the evidence. *Id*. at 1371-72. This Court is undoubtedly familiar with the psychosexual evaluations that have traditionally been procured by U.S. Probation. The unbiased and professional evaluations and associated reports authored by Probation providers are far superior in quality than the subjective reports completed by Dr. Boyd and Dr. Roush in this case. By choosing not to administer standard tests and evaluations to determine sexual deviance and antisociality, Dr. Boyd and Dr. Roush have precluded the government from being able to engage meaningfully with their conclusions in this case. *Id.* Neither Dr. Boyd nor Dr. Roush offers any credible explanation why someone without a sexual interest or attraction to children would share images and videos of child sexual abuse material and why he would store such images on his own private devices. The Defendant had every incentive to paint himself in the most favorable light when he met with Dr. Boyd and Dr. Roush. Both doctors ignore the true nature of the Defendant's criminal conduct, which is no longer in dispute following his guilty plea. The reports both ignore the fact that the Defendant created a specific online group designed to discuss and share images depicting the abuse of children. The Defendant himself screened and "verified" every member of the group, by personally receiving images and videos containing child pornography and by verifying that adults had access to real, live children. The Defendant himself collected and saved child sexual abuse images and videos. Likewise, the Defendant himself admitted to sharing and receiving such images and videos *many* times in the past. Neither report acknowledges nor explains any of these serious and dangerous realities; thus, the Court cannot rely upon the conclusions these reports espouse.

### V.       The Victims are Entitled to Restitution

Prior to December 7, 2018, Title 18 U.S.C. § 2259 directed that, "notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court

shall order restitution for any offenses under this chapter." 18 U.S.C. § 2259(a); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution was defined to include "the full amount of the victim's losses," which includes any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
>
> (B) Physical and occupational therapy or rehabilitation;
>
> (C) Necessary transportation, temporary housing, and child care expenses;
>
> (D) Lost income;
>
> (E) Attorneys' fees, as well as other costs incurred; and
>
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015). The Court may not decline to issue an order under this section because of the economic circumstances of the defendant. 18 U.S.C. § 2259(B)(i).

In *Paroline v. United States*, 572 U.S. 434 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 572 U.S. at 439. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps. First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id.* at 448. Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id.* at 457-

19

59. Recognizing that under the circumstances of most child pornography possession cases – where losses resulted from harm caused by the trafficking of a victim's images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact," *id*. at 455, - the Court held:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 458. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* at 459. That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.* Third, the Court provided sentencing courts the following guidance for how to determine the proper amount of restitution under this standard. *Id*. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*.

The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the

images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*. at 460.

Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000.00. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (December 7, 2018). As detailed in the Restitution Request materials submitted to this Court under seal, some of the victims depicted in the images and videos the Defendant uploaded, viewed, and possessed are seeking restitution for costs associated with attending psychotherapy and/or counseling, medications, loss of income, loss of housing, and for various medical expenses. *See United States v. Monzel*, 930 F.3d at 486 (D.C. Cir. 2019) (noting that *Paroline*'s § 2259(b) restitution calculation is based on the defendant's "contribution to [the victim's] '*general* losses,'" and that the district court's calculation should be "a matter of 'discretion and sound judgment,'" considering the *entire totality* of the defendant's contributions, rather than a narrow, unnecessarily precise "exercise in long division") (emphasis added) (citing *Paroline*, 572 U.S. at 459-60)). The following victims in these known series of images have made restitution requests which have been submitted separately under seal to the Court: Aprilblonde, BluePillow1, Marineland1, At School, Tara, and ZooFamily1. *See* Exhibit 3, Restitution Requests. For the reasons set forth above, the government respectfully requests that the Court order a restitution amount of $31,000.00, to be paid by the Defendant.

**VI.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, each of these factors requires a lengthy sentence of incarceration within the sentencing guideline range. Based on these factors, the government respectfully requests that the Court impose a Guidelines sentence of 180 months' incarceration followed by a period of 10 years' supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    */s/ Rachel Forman*
RACHEL FORMAN
VA Bar Number 89169
Assistant United States Attorney
U.S. Attorney's Office
601 D Street, NW
Washington, D.C.
Office: 202-252-6916
Rachel.forman2@usdoj.gov

**Exhibit 1**

**DSM V**

**US v. Matthew Sharp**

**22-cr-174**

## Development and Course

Individuals with sexual sadism in forensic samples are almost exclusively male, but a representative sample of the population in Australia reported that 2.2% of men and 1.3% of women said they had been involved in bondage and discipline, "sadomasochism," or dominance and submission in the previous year. Information on the development and course of sexual sadism disorder is extremely limited. One study reported that females became aware of their sadomasochistic interest as young adults, and another reported that the mean age at onset of sadism in a group of males was 19.4 years. Whereas sexual sadism per se is probably a lifelong characteristic, sexual sadism disorder may fluctuate according to the individual's subjective distress or his or her propensity to harm nonconsenting others. Advancing age is likely to have the same reducing effect on this disorder as it has on other paraphilic or normophilic sexual behavior.

## Differential Diagnosis

Many of the conditions that could be differential diagnoses for sexual sadism disorder (e.g., antisocial personality disorder, sexual masochism disorder, hypersexuality, substance use disorders) sometimes occur also as comorbid diagnoses. Therefore, it is necessary to carefully evaluate the evidence for sexual sadism disorder, keeping the possibility of other paraphilias or mental disorders as part of the differential diagnosis. The majority of individuals who are active in community networks that practice sadistic and masochistic behaviors do not express any dissatisfaction with their sexual interests, and their behavior would not meet DSM-5 criteria for sexual sadism disorder. Sadistic interest, but not the disorder, may be considered in the differential diagnosis.

## Comorbidity

Known comorbidities with sexual sadism disorder are largely based on individuals (almost all males) convicted for criminal acts involving sadistic acts against nonconsenting victims. Hence, these comorbidities might not apply to all individuals who never engaged in sadistic activity with a nonconsenting victim but who qualify for a diagnosis of sexual sadism disorder based on subjective distress over their sexual interest. Disorders that are commonly comorbid with sexual sadism disorder include other paraphilic disorders.

# Pedophilic Disorder

| Diagnostic Criteria | 302.2 (F65.4) |
|---|---|

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

B. The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

C. The individual is at least age 16 years and at least 5 years older than the child or children in Criterion A.

   **Note:** Do not include an individual in late adolescence involved in an ongoing sexual relationship with a 12- or 13-year-old.

*Specify* whether:

   **Exclusive type** (attracted only to children)

   **Nonexclusive type**

Paraphilic Disorders

*Specify* if:
   **Sexually attracted to males**
   **Sexually attracted to females**
   **Sexually attracted to both**
*Specify* if:
   **Limited to incest**

# Diagnostic Features

The diagnostic criteria for pedophilic disorder are intended to apply both to individuals who freely disclose this paraphilia and to individuals who deny any sexual attraction to prepubertal children (generally age 13 years or younger), despite substantial objective evidence to the contrary. Examples of disclosing this paraphilia include candidly acknowledging an intense sexual interest in children and indicating that sexual interest in children is greater than or equal to sexual interest in physically mature individuals. If individuals also complain that their sexual attractions or preferences for children are causing psychosocial difficulties, they may be diagnosed with pedophilic disorder. However, if they report an absence of feelings of guilt, shame, or anxiety about these impulses and are not functionally limited by their paraphilic impulses (according to self-report, objective assessment, or both), and their self-reported and legally recorded histories indicate that they have never acted on their impulses, then these individuals have a pedophilic sexual interest but not pedophilic disorder.

Examples of individuals who deny attraction to children include individuals who are known to have sexually approached multiple children on separate occasions but who deny any urges or fantasies about sexual behavior involving children, and who may further claim that the known episodes of physical contact were all unintentional and nonsexual. Other individuals may acknowledge past episodes of sexual behavior involving children but deny any significant or sustained sexual interest in children. Since these individuals may deny experiences impulses or fantasies involving children, they may also deny feeling subjectively distressed. Such individuals may still be diagnosed with pedophilic disorder despite the absence of self-reported distress, provided that there is evidence of recurrent behaviors persisting for 6 months (Criterion A) and evidence that the individual has acted on sexual urges or experienced interpersonal difficulties as a consequence of the disorder (Criterion B).

Presence of multiple victims, as discussed above, is sufficient but not necessary for diagnosis; that is, the individual can still meet Criterion A by merely acknowledging intense or preferential sexual interest in children.

The Criterion A clause, indicating that the signs or symptoms of pedophilia have persisted for 6 months or longer, is intended to ensure that the sexual attraction to children is not merely transient. However, the diagnosis may be made if there is clinical evidence of sustained persistence of the sexual attraction to children even if the 6-month duration cannot be precisely determined.

# Associated Features Supporting Diagnosis

The extensive use of pornography depicting prepubescent children is a useful diagnostic indicator of pedophilic disorder. This is a specific instance of the general case that individuals are likely to choose the kind of pornography that corresponds to their sexual interests.

# Prevalence

The population prevalence of pedophilic disorder is unknown. The highest possible prevalence for pedophilic disorder in the male population is approximately 3%–5%. The population prevalence of pedophilic disorder in females is even more uncertain, but it is likely a small fraction of the prevalence in males.

## Development and Course

Adult males with pedophilic disorder may indicate that they become aware of strong or preferential sexual interest in children around the time of puberty—the same time frame in which males who later prefer physically mature partners became aware of their sexual interest in women or men. Attempting to diagnose pedophilic disorder at the age at which it first manifests is problematic because of the difficulty during adolescent development in differentiating it from age-appropriate sexual interest in peers or from sexual curiosity. Hence, Criterion C requires for diagnosis a minimum age of 16 years and at least 5 years older than the child or children in Criterion A.

Pedophilia per se appears to be a lifelong condition. Pedophilic disorder, however, necessarily includes other elements that may change over time with or without treatment: subjective distress (e.g., guilt, shame, intense sexual frustration, or feelings of isolation) or psychosocial impairment, or the propensity to act out sexually with children, or both. Therefore, the course of pedophilic disorder may fluctuate, increase, or decrease with age.

Adults with pedophilic disorder may report an awareness of sexual interest in children that preceded engaging in sexual behavior involving children or self-identification as a pedophile. Advanced age is as likely to similarly diminish the frequency of sexual behavior involving children as it does other paraphilically motivated and normophilic sexual behavior.

## Risk and Prognostic Factors

**Temperamental.**   There appears to be an interaction between pedophilia and antisociality, such that males with both traits are more likely to act out sexually with children. Thus, antisocial personality disorder may be considered a risk factor for pedophilic disorder in males with pedophilia.

**Environmental.**   Adult males with pedophilia often report that they were sexually abused as children. It is unclear, however, whether this correlation reflects a causal influence of childhood sexual abuse on adult pedophilia.

**Genetic and physiological.**   Since pedophilia is a necessary condition for pedophilic disorder, any factor that increases the probability of pedophilia also increases the risk of pedophilic disorder. There is some evidence that neurodevelopmental perturbation in utero increases the probability of development of a pedophilic interest.

## Gender-Related Diagnostic Issues

Psychophysiological laboratory measures of sexual interest, which are sometimes useful in diagnosing pedophilic disorder in males, are not necessarily useful in diagnosing this disorder in females, even when an identical procedure (e.g., viewing time) or analogous procedures (e.g., penile plethysmography and vaginal photoplethysmography) are available.

## Diagnostic Markers

Psychophysiological measures of sexual interest may sometimes be useful when an individual's history suggests the possible presence of pedophilic disorder but the individual denies strong or preferential attraction to children. The most thoroughly researched and longest used of such measures is *penile plethysmography*, although the sensitivity and specificity of diagnosis may vary from one site to another. *Viewing time,* using photographs of nude or minimally clothed persons as visual stimuli, is also used to diagnose pedophilic disorder, especially in combination with self-report measures. Mental health professionals in the United States, however, should be aware that possession of such visual stimuli, even for diagnostic purposes, may violate American law regarding possession of child pornography and leave the mental health professional susceptible to criminal prosecution.

## Differential Diagnosis

Many of the conditions that could be differential diagnoses for pedophilic disorder also sometimes occur as comorbid diagnoses. It is therefore generally necessary to evaluate the evidence for pedophilic disorder and other possible conditions as separate questions.

**Antisocial personality disorder.**   This disorder increases the likelihood that a person who is primarily attracted to the mature physique will approach a child, on one or a few occasions, on the basis of relative availability. The individual often shows other signs of this personality disorder, such as recurrent law-breaking.

**Alcohol and substance use disorders.**   The disinhibiting effects of intoxication may also increase the likelihood that a person who is primarily attracted to the mature physique will sexually approach a child.

**Obsessive-compulsive disorder.**   There are occasional individuals who complain about ego-dystonic thoughts and worries about possible attraction to children. Clinical interviewing usually reveals an absence of sexual thoughts about children during high states of sexual arousal (e.g., approaching orgasm during masturbation) and sometimes additional ego-dystonic, intrusive sexual ideas (e.g., concerns about homosexuality).

## Comorbidity

Psychiatric comorbidity of pedophilic disorder includes substance use disorders; depressive, bipolar, and anxiety disorders; antisocial personality disorder; and other paraphilic disorders. However, findings on comorbid disorders are largely among individuals convicted for sexual offenses involving children (almost all males) and may not be generalizable to other individuals with pedophilic disorder (e.g., individuals who have never approached a child sexually but who qualify for the diagnosis of pedophilic disorder on the basis of subjective distress).

# Fetishistic Disorder

| Diagnostic Criteria | 302.81 (F65.0) |
|---|---|

A. Over a period of at least 6 months, recurrent and intense sexual arousal from either the use of nonliving objects or a highly specific focus on nongenital body part(s), as manifested by fantasies, urges, or behaviors.

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

C. The fetish objects are not limited to articles of clothing used in cross-dressing (as in transvestic disorder) or devices specifically designed for the purpose of tactile genital stimulation (e.g., vibrator).

*Specify:*

**Body part(s)**
**Nonliving object(s)**
**Other**

*Specify* if:

**In a controlled environment:** This specifier is primarily applicable to individuals living in institutional or other settings where opportunities to engage in fetishistic behaviors are restricted.

**In full remission:** There has been no distress or impairment in social, occupational, or other areas of functioning for at least 5 years while in an uncontrolled environment.